IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


UNITED STATES OF AMERICA,
                    Plaintiff,


          v.                                    Case No. 07-20099-JWL


LUIS ARTURO CASTRO-QUEZADA (02),
YEHIA HASSEN (04),
ZIAD MOUSA MUSSALLET (05),
MILO SANTANA SANCHEZ (07),
TRINIDAD MARQUEZ-MARTINEZ (09),
JESSIE DICKINSON (13),
RICHARD A. SANCHEZ (15),
                    Defendants.
_____


UNITED STATES OF AMERICA,
                    Plaintiff,


          v.                                    Case No. 07-20100-JWL


SANTIAGO MALDONADO-VALENZUELA (01),
JAMIE RICARDO DOMINGUEZ-CALDERON (03),
JESUS GABRIEL GANDARA-ESCARCEGA (05),
JUAN JAVIER LUNA-POLANCO (08),
CARLOS CERVANTES-SAMANIEGO (11),

                    Defendants.
_____


UNITED STATES OF AMERICA,
                    Plaintiff,


          v.                                    Case No. 07-20104-JWL


MAYRA VANESSA GANDARA ESCARCEGA (01),
                    Defendant.
_____

## **MEMORANDUM AND ORDER**

On June 15, 2009, the court held a combined motion hearing in *United States v. Castro-Quezada* (07-20099), *United States v. Maldonado-Valenzuela* (07-20100), and *United States v. Gandara Escarcega* (07-20104), taking up various motions related to discovery matters,[1] a motion to suppress statements,[2] a motion to sever, and a motion to suppress electronic surveillance.  At the combined motion hearing, the court took the following motions under advisement: Carlos Cervantes-Samaniego's motion for a bill of particulars (Doc. 156), Mr. Cervantes-Samaniego's motion to sever (Doc. 159) and Mr. Cervantes-Samaniego's motion to suppress electronic surveillance (Doc. 161).  For the reasons discussed below, the court grants in part and denies in part Mr. Cervantes-Samaniego's motion for a bill of particulars; the court denies his motion to sever, and denies his motion to suppress electronic surveillance.

## I. Mr. Cervantes-Samaniego's Motion for a Bill of Particulars (Doc. 156)

In his motion for a bill of particulars, Mr. Cervantes-Samaniego asks for the court to order the government to identify:

1. The location where the alleged conspiracy was formed;

---

[1] With respect to the discovery motions filed by defendant Jessie Dickinson and defendant Carlos Cervantes-Samaniego, the court outlined its rulings on the record and the court filed the Clerk's Courtroom Motions/Miscellaneous Minute Sheet (Doc. 444, Doc. 167, and Doc. 22) detailing its handling of the various discovery motions.  The court also issued an Amended Trial Order (Doc. 447, Doc. 168, and Doc. 23) on June 16, 2009.

[2] The court denied Mr. Cervantes-Samaniego's motion to suppress statements (Doc. 162) for the reasons set forth in full on the record.

2. The persons who were present when the alleged conspiracy was formed or commenced;

3.  The identity of all participants in the conspiracy, including but not limited to any known but unindicted co-conspirators who participated in the conspiracy;

4. The terms of the conspiratorial agreement;

5. The particulars as to all meetings and conversations in which any defendant participated including the names of all persons the Government will claim at trial were co-conspirators;

6.  The location of any meetings or conspiratorial conversations in which any defendant allegedly participated;

7. The approximate date upon which Mr. Cervantes-Samaniego and all other defendants allegedly joined the conspiracy;

8. The identification of which co-conspirator performed each specific act alleged in the indictment;

9. The nature and extent of the alleged participation of Mr. Cervantes-Samaniego in the conspiracy given there is nothing in the discovery provided and directly from the documents of the District of Kansas investigation which allege any "overt" act until July, 2007; and

10. The manner in which the alleged conspiracy was designed to achieve its alleged purpose.

"Motion for Bill of Particulars," Doc. 156, at 1-2.  The motion is granted in part and denied in part.  The government is ordered to disclose the identities of the known unindicted co-conspirators on the time-line discussed below.  In all other respects, the motion is denied.

Generally, an indictment is held only to "minimal constitutional standards" and is judged "by practical rather than technical considerations."  *United States v. Avery*, 295 F.3d 1158, 1174 (10th Cir. 2002) (quoting *United States v. Dashney*, 117 F.3d 1197, 1205 (10th Cir. 1997)).  "'An indictment is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense.'"  *United States*

*v. Redcorn*, 528 F.3d 727, 733 (10th Cir. 2008) (citing *United States v. Chisum*, 502 F.3d 1237, 1244 (10th Cir. 2007)); *see also United States v. Poole*, 929 F.2d 1476, 1479 (10th Cir. 1991) (quoting *United States v. Staggs*, 881 F.2d 1527, 1530 (10th Cir. 1989)).

In deciding whether to grant a motion for a bill of particulars, the district court has broad discretion. *United States v. Jenkins*, 313 F.3d 549, 558 (10th Cir. 2002); *see also United States v. Edmonson*, 962 F.2d 1535, 1541 (10th Cir. 1992). The purpose of a bill of particulars is to supplement the allegations in the indictment when necessary to: (1) inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense; (2) avoid unfair surprise to the defendant at trial; and (3) preclude a second prosecution for the same offense. *United States v. Ivy*, 83 F.3d 1266, 1281 (10th Cir. 1996) (quotations omitted); *see also United States v. Cooper*, 283 F. Supp. 2d 1215, 1239-40 (D. Kan. 2003).

Further, the purpose of the bill of particulars is to minimize the defendant's surprise to the substantive facts of the charges, but not to obtain discovery, evidentiary detail of the government's case, or information regarding the government's legal theories. *United States v. Hopkins*, 716 F.2d 739, 745 (10th Cir. 1982). "'Since the defendant is not entitled to know all the evidence the government intends to produce, but only the theory of the government's case, the district court does not abuse its discretion in denying defendant's motion for a bill of particulars where defendant has been served with a sufficient indictment.'" *United States v. Anderson*, 31 F. Supp. 2d 933, 938 (D. Kan. 1998) (quoting *United States v. Sapp*, 835 F. Supp. 1346, 1348 (D. Kan. 1993)).

4

"Unless the request for the bill of particulars shows, on its face, that failure to grant the request would result in prejudicial surprise, the preclusion of an opportunity for meaningful defense preparation, [or double jeopardy problems,] *defendant has the burden* to show that his or her request meets one of the three criteria." *Id.* (emphasis in the original) (citing *United States v. Wright*, 826 F.2d 938, 943 (10th Cir. 1987)).

Mr. Cervantes-Samaniego is entitled to know the identity of any unindicted coconspirators. *See, e.g.*, *United States v. Allen,* 289 F. Supp. 2d 230, 237-38 (N.D.N.Y. 2003); *United States v. Murgas*, 967 F. Supp. 695, 702 (N.D.N.Y. 1997); *United States v. Taylor*, 707 F. Supp. 696, 700 (S.D.N.Y. 1989); *United States v. Rogers*, 617 F. Supp. 1024, 1028 (D. Colo. 1985). Without this information, the defendant could be subject to prejudicial surprise or double jeopardy problems. As discussed in *Anderson*,

> For example, if an unindicted coconspirator were to testify at trial, the nature of the conspiracy and the ties to various defendants might change dramatically. Moreover, leaving unnamed coconspirators undisclosed subjects the defendants to a risk of double jeopardy if the government one day sought to indict the defendants because of their alleged conspiracy with the unnamed coconspirators.

31 F. Supp. 2d at 938.

However, Mr. Cervantes-Samaniego is not entitled to know the other information he demands the government disclose in his motion for a bill of particulars. The government is not required to disclose all the evidence it intends to produce, but rather only its theory of the case. *Sapp*, 835 F. Supp. at 1348. With regard to the other requests for information, Mr. Cervantes-Samaniego has not made a serious attempt to explain

5

how he would suffer prejudicial surprise, an inability to prepare a meaningful defense, or double jeopardy problems if this information is not disclosed.  This type of information is more geared toward discovery–not the avoidance of unfair prejudice. Therefore, Mr. Cervantes-Samaniego's motion for a bill of particulars is granted in part and denied in part.  As previously outlined in the court's Memorandum and Order (Doc. 397) granting in part and denying in part Mr. Dickinson's motion for a bill of particulars (Doc. 283), the government shall disclose the identity of any unindicted co-conspirators forty-five days before trial.  However, defense counsel shall not disclose this information to their clients until thirty days before trial.

## II. Mr. Cervantes-Samaniego's Motion to Sever (Doc. 159)

Mr. Cervantes-Samaniego argues that "the interests of justice dictate that Mr. Cervantes-Samaniego should be allowed to sever his trial from that of his co-defendants" pursuant to Fed. R. Crim. P. 14.  "Memorandum in Support of Motion to Sever Pursuant to Rule 14 of the Federal Rules of Criminal Procedure," Doc. 160, at 1.  Mr. Cervantes-Samaniego argues that he is "far less culpable than the persons charged with more substantive offenses" and that "[i]f this case proceeds with a single trial for all, the spillover of evidence presented against other defendants will cause undue prejudice against Mr. Cervantes-Samaniego and will taint the jury's ability to differentiate between the various defendants and the specific evidence against or in favor of each."[3]  *Id.* at 3.

---

[3]In its response to the defendant's motion to sever, the government is quick to point out that Mr. Cervantes-Samaniego's contention that he is a minor player or less culpable

(continued...)

For the reasons discussed below, Mr. Cervantes-Samaniego's motion to sever (Doc. 159) is denied.

A. *Motion to Sever Standard*

Rule 8(b) of the Federal Rules of Criminal Procedure provides that defendants may be charged together "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed. R. Crim. P. 8(b). "There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). Especially in a conspiracy case, like the one involved here, there is a preference that defendants who are charged together should be tried together. *See United States v. Jones*, 530 F.3d 1292, 1302 (10th Cir. 2008); *see also United States v. Small*, 423 F.3d 1164, 1181 (10th Cir. 2005) (citing *United States v. Hack*, 782 F.2d 862, 870 (10th Cir. 1986)); *United States v. Iiland*, 254 F.3d 1264, 1269-70 (10th Cir. 2001) (citing *United States v. Edwards*, 69 F.3d 419, 434 (10th Cir. 1995)). "'In deciding on a motion for severance, the district court has a duty to weigh the prejudice resulting from a joint trial of co-defendants against the expense and inconvenience of separate trials.'" *Small*, 423 F.3d 1181 (quoting *Hack*, 782 F.2d at 870). Federal Rule of Criminal Procedure 14 permits a district court to grant a severance of defendants if "it appears that

---

(...continued)

than others in this case is not borne out by the evidence the government plans to present at trial. *See* "Government's Consolidated Response to Defendant's Pretrial Motions," Doc. 163, at 22-27.

a defendant or the government is prejudiced by a joinder." Fed. R. Crim. P. 14.  In

*Zafiro*, the Supreme Court explained:

> [A] district court should grant severance under Rule 14 only if there is a serious
> risk that a joint trial would compromise a specific trial right of one of the
> defendants, or prevent the jury from making a reliable judgment about guilt or
> innocence.  Such a risk might occur when the evidence that the jury should not
> consider against a defendant and that would not be admissible if a defendant were
> tried alone is admitted against a codefendant.  For example, evidence of a
> codefendant's wrongdoing in some circumstances erroneously could lead a jury
> to conclude that a defendant was guilty.  When many defendants are tried
> together risk of prejudice is heightened.  Evidence that is probative of a
> defendant's guilt but technically admissible only against a codefendant also might
> present a risk of prejudice.

506 U.S. at 539 (internal citations omitted).  While it is true that a district court is more

likely to determine separate trials are necessary when the risk of prejudice is high, the

Tenth Circuit has made clear that "'less drastic measures, such as limiting instructions,

often will suffice to cure any risk of prejudice.'" *United States v. Rodriguez-Aguirre*, 108

F.3d 1228, 1234 (10th Cir. 1997) (quoting *Zafiro*, 506 U.S. at 539); *see also United

States v. Faulkner*, 323 F. Supp. 2d 1111, 1121 (D. Kan. 2004).  "Rule 14 leaves the

determination of risk of prejudice and any remedy for such prejudice to the sound

discretion of the district court." *Faulkner*, 323 F. Supp. 2d at 1121 (citing *Zafiro*, 506

U.S. at 541).

The Tenth Circuit has found that "neither 'a mere allegation that defendant would

have a better chance of acquittal in a separate trial,'  nor an argument that evidence

against one defendant would have a 'spillover effect' on another defendant demonstrates

prejudice." *Jones*, 530 F.3d at 1303 (quoting *Small*, 423 F.3d at 1182); *see also United*

8

*States v. Powell*, 982 F.2d 1422, 1432 (10th Cir. 1992); *United States v. Cardall*, 885 F.2d 656, 668 (10th  Cir. 1989); *United States v. Hack*, 782 F.2d 862, 870 (10th Cir. 1986).    "When  sufficient  evidence  is  presented  to  connect  the  defendant  to  the conspiracy charged, his argument that severance is required due to the overwhelming evidence against co-defendants is without merit."  *United States v. Espinosa*, 771 F.2d 1382, 1409 (10th Cir. 1985).  In addition, potential "spillover" can be cured with proper limiting instructions at trial.  *See Zafiro*, 506 U.S. at 539 (noting trial court's use of limiting instructions will often serve to cure any risk of prejudice caused by joint trial); *United  States  v.  Emmons*, 24 F.3d 1210, 1219 (10th Cir. 1994) (concluding jury instructions  eliminated  any  alleged  spillover  effect  of  disproportionate  evidence presented against co-defendant).

*B. Analysis*

The government has charged Mr. Cervantes-Samaniego in four counts in the Superseding Indictment in Case No. 07-20100.[4]  In his motion to sever,  Mr. Cervantes-Samaniego argues that severance is merited because there is a possibility that the

_____

[4]Mr. Cervantes-Samaniego is charged in Count 1, along with ten other co-defendants, with conspiracy to distribute and possess with intent to distribute 1000 kilograms or more of marijuana and five kilograms or more of cocaine.  Mr. Cervantes-Samaniego is charged in Count 5, along with Santiago Maldonado-Valenzuela, with conspiracy to maintain a residence for the purpose of storing and distributing marijuana and cocaine. Mr. Cervantes-Samaniego is charged in Count 17 with using a communication facility to commit, cause and facilitate the offense set forth in Count 1.  Finally, Mr. Cervantes-Samaniego is charged in Count 19 with a knowing and intentional unlawful use of a firearm in relation to maintaining a residence for the distribution of marijuana and cocaine and in relation to drug trafficking.  *See* Superseding Indictment, Doc. 51, at Counts 1, 5, 17, and 19.

9

government's evidence presented against the seemingly more culpable or involved defendants will spill over and taint Mr. Cervantes-Samaniego in the eyes of the jury. However, as discussed above, any potential problems with spillover can be cured with proper limiting instructions at trial. The Tenth Circuit has made clear that where there is sufficient evidence connecting the defendant to the conspiracy, arguments regarding discrepancy in evidence between co-defendants are unpersuasive. *See Espinosa*, 771 F.2d at 1409.

In deciding a motion for severance, the district court has a duty to weigh the prejudice resulting from a joint trial of co-defendants against the expense and inconvenience of separate trials. Mr. Cervantes-Samaniego has failed to show prejudice that would outweigh the benefit of a single trial. The public will benefit by one trial due to the intertwined nature of the evidence. A single trial makes for a process which is not only more economical and efficient, but also more fair than if there were a series of trials which at worst could produce inconsistent results because of the different triers of fact or at least would afford the various defendants separated from the main case fortuitous unwarranted discovery of the government's case and a "test run" for the government to hone its presentation against any later tried defendants.

Mr. Cervantes-Samaniego argues that because the evidence against the other defendants is stronger than the evidence against him, the introduction of that evidence could potentially have a "spillover effect" on him. However, as discussed previously, such a spillover argument is unpersuasive. Rule 14 does not compel severance if the trial

court, in its discretion, creates a remedy which abates the risk of prejudice. The court believes that proper jury instructions can protect against whatever legitimate concern Mr. Cervantes-Samaniego has about spillover of evidence offered exclusively as to one set of charges or defendants. Mr. Cervantes-Samaniego has failed to show that less drastic measures, like limiting instructions, would not suffice to cure the risk of prejudice. Mr. Cervantes-Samaniego also has not shown a serious risk that a specific trial right will be compromised or that the jury will be prevented from making a reliable judgment. Therefore, the court concludes Mr. Cervantes-Samaniego has failed to show any risk of prejudice that outweighs the expense and inconvenience of separate trials. Consequently, Mr. Cervantes-Samaniego's motion to sever (Doc. 159) is denied.

## III. Mr. Cervantes-Samaniego's Motion to Suppress Electronic Surveillance (Doc. 161)

Mr. Cervantes-Samaniego seeks suppression of evidence gathered as a result of court authorized wire and electronic intercepts pertaining to Kansas Target Telephone 8 (913-424-2559) and Kansas Target Telephone 9 (816-372-6119). He makes three arguments attacking the validity of the intercepted wire communications that he asserts support suppression. First, he claims that the supporting affidavits lacked probable cause that the defendant was committing drug related crimes. "Carlos Cervantes-Samaniego's Motion to Suppress the Fruits of Electronic Surveillance," Doc. 161, at 2-5. Second, he argues that the applications for the seventh extension approved on July 20, 2007 and the

11

eighth extension approved on August 17, 2007 for Kansas Target Telephone 9 cited an authorizing order that was expired in violation of 18 U.S.C. § 2516(1), and consequently such an error merits suppression. *Id.* at 5. Finally, he argues that the affidavits did not establish necessity as required under 18 U.S.C. § 2518(1)(c). *Id.* at 5-6. Having considered the written and oral arguments presented by the parties, the court, for the reasons discussed below, denies Mr. Cervantes-Samaniego's motion to suppress electronic surveillance (Doc. 161).

*A. Probable Cause*

In his motion to suppress electronic surveillance, Mr. Cervantes-Samaniego asserts that "[b]ecause there was not probable cause on the face of the affidavits concerning Morro [believed to be Mr. Cervantes-Samaniego], his communications should have been minimized unless there was an immediate identification by law enforcement of a communication for which law enforcement would have probable cause to believe was related to a violation of 18 U.S.C. 2156." "Carlos Cervantes-Samaniego's Motion to Suppress the Fruits of Electronic Surveillance," Doc. 161, at 4. Therefore, "[u]nder the rationale of *Franks v. Delaware*, supra all statements of Morro should be thrown out and all fruits of the wiretap which the Government plans on using against Mr. Cervantes-Samaniego should be suppressed." *Id.* at 4-5.

Mr. Cervantes-Samaniego's argument that the government lacked probable cause with respect to him personally misunderstands the legal requirements of the wiretap statute. As the government points out in its response, Mr. Cervantes-Samaniego has not

12

argued that any of the affidavits in support of the wiretap applications fail to establish that the particular target telephones were being used in furtherance of criminal activity. In fact, the wiretap statute only requires that an application for a wiretap include "the identity of the person, if known, whose communications are to be intercepted."  18 U.S.C. § 2518.  If there is probable cause to believe that a certain telephone is being used for criminal activity, then that is enough to support a Title III wiretap order.  *See* 18 U.S.C. § 2518(3)(d).  "[W]hen there is probable cause to believe that a particular telephone is being used to commit an offense but no particular person is identifiable, a wire interception order may, nevertheless, properly issue under the statute. *United States v. Kahn*, 415 U.S. 143, 157 (1974).  As the Tenth Circuit has made clear, "the government has no duty to establish probable cause as to each interceptee.  It is sufficient that there was probable cause to tap the phone." *United States v. Nunez*, 877 F.2d 1470, 1472 n.1 (10th Cir. 1989) (citing *United States v. Figuero*, 757 F.2d 466, 470-71 (2d Cir. 1985); *see e.g.*, *United States v. Diltz*, 622 F.2d 476, 482-83 (10th Cir. 1980); *United States v. Russo*, 527 F.2d 1051, 1056 (10th Cir. 1975)).

While it is true that an individual whose conversations will probably be intercepted by a wiretap must be identified in the wiretap application and order if law enforcement has probable cause to believe that individual is committing the offense for which the wiretap is sought, *United States v. Donovan*, 429 U.S. 413, 427 (1977), the Supreme Court also makes clear in *Donovan* that the failure to comply "fully" with section 2518(1)(b)(iv) does not render unlawful a wiretap order that in all other respects

13

satisfies the statutory requirements. *Id.* at 433-34. The Tenth Circuit has applied the ruling in *Donovan* and explained that the failure to name a particular defendant, if all the requisite statutory factors were present, "in no way detracts from the sufficiency of those factors." *United States v. Armendariz*, 912 F.2d 602, 608 (10th Cir. 1991) (quoting *Donovan*, 429 U.S. at 435).

Here, "Morro" was listed in the Colorado T-III applications and affidavits as having been intercepted as early as August 16, 2006. Various affidavits filed in Colorado described "Morro" as someone who "appears to be a conspirator within the organization with close ties to Chicharo," "appears to be a Spanish-speaking male who works in conjunction with CHICHARO," and "appears to be a source based in Mexico with ties to Chicharo." *See* Colorado Affidavit in Support for the Interception of Target Telephone Seven (dated September 25, 2006); Colorado Affidavit in Support for the Interception of Target Telephone Six (dated October 18, 2006); Colorado Affidavit in Support for the Continued Interception of Target Telephone One (dated November 6, 2006). In addition, "Morro" was listed in every Kansas affidavit in support of the wiretap applications as a "person expected to be intercepted" and as a "target violator." *See* Affidavits in Support of the Interception of Kansas Target Phone 8 (and its three extensions; Affidavits in Support of the Interception of Kansas Target Phone 9 (and its eight extensions). Nonetheless, there does not need to be probable cause as to each named interceptee. Rather, there must only be probable cause that the particular telephones being intercepted are being used to commit the listed crimes. Mr. Cervantes-

14

Samaniego's argument that the government lacked probable cause as to him is irrelevant, and therefore, the court denies Mr. Cervantes-Samaniego's motion to suppress on this ground.

### B. Expired Order

In his motion to suppress electronic surveillance, Mr. Cervantes-Samaniego asserts that because in the seventh and eighth extensions of the wiretap orders for Kansas Target Phone 9 the identity of the authorizing person was not properly provided by the government, the requirements of 18 U.S.C. §§ 2516(1) and 2518 were not met. "Carlos Cervantes-Samaniego's Motion to Suppress the Fruits of Electronic Surveillance," Doc. 161, at 5. Mr. Cervantes-Samaniego argues as a result, the initial applications and orders were deficient, and Mr. Cervantes-Samaniego should be entitled to suppression of the fruits of those wiretaps, including the recordings. *Id.*

Under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522, the Attorney General or a duly empowered high-ranking subordinate must review and approve wiretap requests before an application to intercept wire or oral communications is filed with the district court. *See* 18 U.S.C. § 2516(1). The application with the court "shall state the applicant's authority to make such application," *id.* § 2518(1), and must include "the identity of. . .the officer authorizing the application." *Id.* § 2518(1)(a).

"The Attorney General, Deputy Attorney General, Associate Attorney General, or any Assistant Attorney General, any acting Assistant Attorney General, or any Deputy

Assistant Attorney General or acting Deputy Assistant Attorney General in the Criminal Division or National Security Division specially designated by the Attorney General, may authorize" a wiretap application. *Id.* § 2516(1). The Attorney General delegates the authority to approve wiretap applications to selected officials using Attorney General Orders. Therefore, to substantiate that the wiretap applicant has the "authority to make such application" as required by 18 U.S.C. § 2518(1), the government in its wiretap application must reference the specific Attorney General Order currently in effect that delegates the authority.

Mr. Cervantes-Samaniego is correct that the government cited an outdated Attorney General order in two applications for an extension of the interception of Kansas Target Telephone 9. *See* "Application for a Seventh Extension of Interception of wire Communications," (filed on July 20, 2007); "Application for an Eighth Extension of Interception of Wire Communications," (filed on August 17, 2007). In fact, the government concedes that it referenced the incorrect Attorney General Order; however, it argues that this was merely an "administrative error" and that "such a technical or minor error does not undermine the 'critical precondition' that only certain DOJ officials 'responsive to the political process' authorize wiretap applications." "Government's Consolidated Response to Defendant's Pretrial Motions," Doc. 163 (internal citations omitted), at 37. Consequently, the government contends that suppression is not warranted.

In these applications, the government cited Attorney General Order No. 2758-

16

2005, which had been revoked and replaced by Order No. 2887-2007.[5]  The government

eventually filed a notice of the expired authorizing order on May 7, 2009.[6]

      The key inquiry is whether the government has failed to satisfy "any of those

statutory requirements that directly and substantially implement the congressional

intention to limit the use of intercept procedures to those situations clearly calling for the

employment of this extraordinary device."  *See United States v. Giordano*, 416 U.S. 505,

527 (1974); *see also United States v. Swann*, 526 F.2d 147, 149 (9th Cir. 1975) (Minor

facial insufficiency "that does not substantially impair the accomplishment of Congress'

purpose" does not warrant suppression).  Not every noncompliance with a Title III

requirement mandates suppression.  *See, e.g., United States v. Chavez*, 416 U.S. 562, 570

(1974) (Suppression was not required even though "[t]he application and order for the

Chavez wiretap did not correctly identify the individual authorizing the application as

18 U.S.C. § 2518(a) and 4(d) require" because the Attorney General had in fact

authorized the application.).  *But see Giordano*, 416 U.S. 505 (holding suppression was

required where the application was "in fact, not authorized by one of the statutorily

---

     [5]  On July 3, 2007, Attorney General Alberto Gonzales signed a new order,
Attorney General Oder No. 2887-2007, expanding the list of designated officials
authorized to approve wiretap applications to include selected officials in the newly
created National Security Division.  However, while the new order did not change the
Criminal Division officials authorized to approve wiretap application, it did revoke
Order 2758-2005 effective midnight July 4, 2007.

     [6]The government explained that it believed that it had previously filed this notice;
however, upon reviewing the pleadings, it discovered that the notice had not been filed.

17

designated officials"). The error in this case is like the error in *Chavez.* Although the application referenced the incorrect Attorney General Order, the person authorizing the wiretap application had the authority to approve wiretap applications.

Minor errors in a wiretap application or order do not warrant suppression. *See, e.g.*, *United States v. Callum*, 410 F.3d 571, 576 (9th Cir. 2005) (suppression not required where the government's application did not list an authorizing official, where in fact, a proper official had given authorization); *United States v. Fudge*, 325 F.3d 910, 918 (7th Cir. 2003) (refusing to suppress evidence even though order granting the wiretap application did not identify the authorizing DOJ official); *United States v. Radcliff*, 331 F.3d 1153, 1160-63 (10th Cir. 2003) (refusing to suppress evidence where wiretap order listed every DOJ official by tittle with legal authority to authorize applications rather than the official who authorized the particular application); *United States v. London*, 66 F.3d 1227, 1232-33 (1st Cir. 1995) (denying motion to suppress where a signature page for an official who was not statutorily empowered to authorize a wiretap application was attached when in fact a statutorily-empowered official had authorized the application and the first page of the letter identified that official).

Other district courts have considered this very issue and have found that this type of error did not merit suppression. *See, e.g., United States v. Lopez*, 2008 WL 2156758 (C.D. Cal. May 19, 2008) (dismissing the impact of citing an expired designation order); *United States v. Tinnin*, 2008 WL 1786991, at *9 (D. Minn. Apr. 17, 2008) ("The application's mere reference to a revoked designation order, when a new order

18

containing the same authorizations was in place, did not compromise the statutory scheme so as to make the interception unlawful."); *United States v. Mainor*, 2007 WL 2702810 (E.D. Pa. Sept. 12, 2007) (dismissing the impact of citing an expired designation order). Therefore, the defendant's argument that referencing the incorrect Attorney General Order invalidates the approval of the applications is unpersuasive; and the evidence gathered from electronic surveillance cannot be suppressed on this basis.

*C. Necessity*

Finally, Mr. Cervantes-Samaniego argues that the government failed to establish that electronic surveillance was a matter of "necessity" because traditional investigative techniques were insufficient. *See* "Carlos Cervantes-Samaniego's Motion to Suppress the Fruits of Electronic Surveillance," Doc. 161, at 5-6.

Title III sets out a specific application procedure for federal investigators seeking permission to wiretap crime suspects. *United States v. Small*, 423 F.3d 1164, 1172 (10th Cir. 2005). A judge may approve a wiretap application and authorize a wiretap order only if, among other things, "the wiretap is 'necessary' to investigate a serious offense enumerated on a statutory list." *United States v. VanMeter*, 278 F.3d 1156, 1159 (10th Cir. 2002). "This requirement is intended to ensure that the relatively intrusive device of wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Iiland*, 254 F.3d 1264, 1267 (10th Cir. 2001) (quotations omitted); *see also United States v. Edwards*, 69 F.3d 419, 429 (10th Cir. 1995). "If an application was granted without meeting the necessity

requirement, the wiretap evidence must be suppressed. *Iiland*, 254 F.3d at 1267 (quotations omitted). The wiretap orders are presumed valid, and defendants bear the burden of proof to show otherwise. *Radcliff*, 331 F.3d at 1160; *United States v. Smart*, 278 F.3d 1168, 1172 (10th Cir. 2002); *Iiland*, 254 F.3d at 1268.

The wiretap application is required to contain a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). This rule is known as the "necessity" requirement. *See United States v. Mondragon*, 52 F.3d 291, 293 (10th Cir. 1995). The authorizing judge must similarly find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id.* § 2518(3)(c); *accord Small*, 423 F.3d at 1172 (quoting the statute). Traditional investigative techniques include standard visual and aural surveillance, questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary), use of search warrants, infiltration by undercover agents or informants, pen registers, and trap and trace devices. *United States v. Cline*, 349 F.3d 1276, 1280 (10th Cir. 2003); *see also United States v. Killingsworth*, 117 F.3d 1159, 1163 (10th Cir. 1997). If the government has not tried these traditional techniques, it must explain the failure with particularity. *Cline*, 349 F.3d at 1280. Generalities, or statements in conclusory language of the statute, are insufficient to support a wiretap application; the statements must be factual and they must specifically relate to the individuals being

20

targeted by the wiretap.  *Id.* at 1280-81.  The court must consider all the facts and circumstances and read the necessity requirement in a common sense fashion, *id.* at 1281, rather than hypertechnically, *Smart*, 278 F.3d 1172.

Here, Mr. Cervantes-Samaniego challenges the validity of the wiretap authorizations on Kansas Target Telephone 8 (913-424-2559) and Kansas Target Telephone 9 (816-372-6119).  Mr. Cervantes-Samaniego asserts that the government used "boilerplate" explanations of necessity and that the government failed to try other traditional methods of investigation, like grand jury subpoenas, search warrants, search of trash, and pen registers.  The defendant argues that because the government failed to establish the necessity requirement, "all alleged wiretap statements of Mr. Cervantes-Samaniego should be thrown out and the fruits of the wiretap suppressed."  "Carlos Cervantes-Samaniego's Motion to Suppress the Fruits of Electronic Surveillance," Doc. 161, at 6.  The court has carefully reviewed the wiretap applications, affidavits, and orders associated with these target phones and the court finds that the defendant has not rebutted the presumption that the wiretap orders were valid.

## 1. Kansas Target Telephone 8

The initial affidavit[7] submitted in support of the application is seventy-four pages in length and describes in detail the investigation of an organization that was believed to be distributing large amounts of marijuana and cocaine in Kansas, Missouri, Colorado,

---

[7]*See* Government's Exhibit 8, Affidavit in Support of Application for Order Authorizing Interception of Wire Communications for Target Phones # 1 and # 2 (dated Aug. 1, 2007).

Minnesota, Virginia, Mexico, and other locations, yet unknown.[8]   Kansas Target Telephone 8 is registered to Ysidro Juarez, a.k.a. "Rene" and believed to be used by him. See "Affidavit in Support of Application for an Order Authorizing the Interception of Wire and Electronic Communications," at ¶ 10.   This telephone is identified as a replacement for Colorado Target Telephone 1 (720-219-4889) which was stolen from Rene's vehicle on November 25, 2006.   *Id.*   The affidavit first lists the "Target Communication Devices," "Persons Expected to be Intercepted," and "Target Violators." The affidavit then goes on to describe the "Prior applications" for electronic surveillance for the various individuals believed to be involved with Rene's drug trafficking ring. The affidavit next provides a "Background of Investigation" describing how the investigation began and what information had been gathered at this point in the investigation–much of this information had been gathered on the basis of prior wiretaps orders from other jurisdictions. *See id.* at ¶ ¶ 19-51.

The affidavit then details "Toll Analysis," *see id.* at ¶ ¶ 52-53,  and explains that from the period of December 1, 2006 to December 12, 2006, the Kansas Target

---

[8] The wiretap on Kansas Target Telephone  8 was re-authorized three times, with affidavits in support of sixty-five, seventy-one, and seventy-eight pages in length.  Each affidavit in support for continued wiretapping incorporated the previous affidavits and added any information that had been gained since the previous authorization. *See* "Affidavit in Support of Application for Extension of the Order Authorizing the Interception of Wire and Electronic Communications" (dated January 12, 2007), "Affidavit in Support of Application for a Second Extension of the Order Authorizing the Interception of Wire and Electronic Communications" (dated February 12, 2007), and "Affidavit in Support of Application for a Third Extension of the Order Authorizing the Interception of Wire and Electronic Communications," (dated March 22, 2007).

Telephone 8 had placed or received approximately eighty-five calls.[9]  In this time frame, Kansas Target Telephone 8 had sixteen contacts with 561-846-9008, identified as utilized by JOHN[10]; had twelve contacts with 432-664-5011, identified as utilized by CARLOS[11]; had eleven contacts with 620-430-7075, identified as utilized by VERO[12];

---

[9] As previously explained, Kansas Target Telephone 8 was a replacement phone for Colorado Target Telephone 1, which was stolen from Rene's vehicle.  Based on toll analysis previously accomplished on Colorado Target Telephone 1, it was believed that Rene was contacting the same subjects with Kansas Target Telephone 8 as he had been with Colorado Target Telephone 1.  For example, in the period November 6, 2007 to November 25, 2007, the Colorado Target Telephone 1 placed or received approximately eighty-five calls.  In this time period, Colorado Target Telephone 1 had forty-eight contacts with cellular telephone numbers 804-302-2107 and 561-846-9008, which were identified as cellular phones used by JOHN during the DEA Denver ongoing T-III intercepts.  Colorado Target Telephone 1 had twenty contacts–a combination of telephone calls and text messaging–with 320-430-7075, identified as utilized by VERO.  Colorado Target Telephone 1 had seventeen contacts with 432-664-5011, identified as utilized by CARLOS.

[10] The affidavit identifies JOHN in the "Persons Expected to be Intercepted" section as Yehia Hassen, a.k.a. John Hassen/John, and describes him as one of Rene's major narcotics customers, who resides in Virginia.  According to the affidavit, Rene is known to transport significant amounts of narcotics to John and collect proceeds of drug sales from John.

[11] The affidavit identifies CARLOS in the "Persons Expected to be Intercepted" section as Carlos Payne, and describes him as a Spanish and English speaking male, who is a co-conspirator in John and Rene's drug trafficking cell in the Virginia area.  Based off of intercepts from DEA Denver, the affiant believes Rene and John referenced Carlos when discussing drug debts and payments over Colorado Target Telephone 1.  DEA Denver also identified frequent contacts between Carlos and Rene when Rene was using Colorado Target Telephone 2.

[12] The affidavit identifies VERO in the "Persons Expected to be Intercepted" section as Veronica Ortiz, and describes her as a Hispanic female who is a narcotics and drug proceeds courier for Rene based out of Dodge City, Kansas.

had two contacts with 913-499-5256, identified as utilized by ERICA[13]; had fourteen contacts with 303-241-1830, identified as utilized by ROSALBA[14]; and had thirteen contacts with 432-631-8329, identified as utilized by RENE's father.

Following the toll analysis section, the affidavit has a roughly nineteen page section describing the necessity for the wiretap and explaining why traditional methods of investigation are not sufficient. Within the necessity section, the affiant has subsections for "Undercover Agents & Confidential Sources," "Surveillance," "Search Warrants," "Searches of Trash at Target Locations," "Pen Registers and Subscriber Information," and "Interviews/Grand Jury Subpoenas/Immunity." The affiant explains that based on his training and experience and the experience of the investigative team, the interception of wire and electronic communications "is the only investigative technique that has a reasonable likelihood of success in assisting to secure evidence needed to prove beyond a reasonable doubt that . . . the 'Target Violators' are acting as part of RENE's drug trafficking organization and are engaged in the possession and distribution of illicit drugs and the laundering of the monetary proceeds." *Id.* at ¶ 54.

_____

[13] The affidavit identifies ERICA in the "Persons Expected to be Intercepted" section as a Spanish-speaking female, who is a girlfriend of Rene, assists him in the transportation of drugs and drug proceeds, and resides in the Kansas City metropolitan area.

[14] The affidavit identifies ROSALBA as Rosalba Lerma-Terrazas, a.k.a. China, and describes her as Rene's wife. She was the listed subscriber for Colorado Target Telephone 1. She resides at 1330 East 89th Avenue in Denver, Colorado and the investigation to date indicates that she and the Rene drug trafficking cell knowingly use this residence as a storage location for drugs and/or drug proceeds.

The affiant explains that the interception of wire and electronic communications over Kansas Target Telephone 8 is necessary to help the government to achieve the objectives of the investigation, namely:

> 1) to identify the full scope of RENE's drug trafficking organization, and obtain identification of key personnel belonging to the RENE's drug trafficking organization;[15] 2) to identify the scope and role of all suppliers of narcotics to the identified conspirators; 3) to determine the identity, scope, and role of all transporters of drugs to the identified conspirators; 4) to determine the identity of the main customers of the identified conspirators; 5) to obtain stash locations where narcotics are stored prior to distribution; 6) to discern the management and disposition of proceeds generated by the Target Organizations narcotics trafficking and; 7) to assert the government's right to seize and forfeit assets acquired with such illegally earned proceeds.

*Id.*  While interceptions of other target telephones have been productive, the affidavit explains that the previous interceptions "have not fully illuminated the scope of the RENE's drug organization due to the sheer magnitude and size of the identified and unidentified members of the organization, and the geographical boundaries supplied by RENE."  *Id.* at ¶ 55.  These previous interceptions "have provided information on only one small section of the RENE's Organization."  *Id.*  Furthermore, the affiant explains that the relocation of intercepts of Rene and Kansas Target Telephone 8 to the District of Kansas will "further the investigation due to the logistical and operational issues arising out of Rene being intercepted in the District of Colorado, even though his residence has changed into the District of Kansas."  *Id.* at ¶ 58.

Next, the affidavit explains the limitations of probable cause traffic stops.

_____

[15] Almost uniformly throughout the affidavit, the affivant uses "the Rene's" when describing the drug trafficking organization investigated by these wiretaps.

Probable cause traffic stops, while extremely important, cannot fully identify the scope and extent of the activities of supply sources.  "This is because in conducting probable cause traffic stops without prior knowledge or history of the violators, investigators are forced to deal with only the evidence seized during that traffic stop and are unable to determine the full scope of the violator's activities."  *Id.* at ¶ 59.  The affidavit goes on to discuss that the probable cause traffic stops conducted on August 22, September 1, October 6, October 7, and December 6, 2006, were only made as a result of knowledge and information gleaned from previous intercepts of Rene's communications.   In addition, the affidavit explains that these stops were a direct result of the intercepts of Rene's communications, and without the intercepts, investigators would not have known how and when to conduct the stops.

The affidavit then goes on to describe the lack of viable candidates to serve as confidential/undercover sources to infiltrate Rene's drug trafficking organization.  The affidavit does describe a potential "Source of Information" (SOI #1); however, the affiant believes that this individual does not appear to have intimate knowledge of the organization or even contact with any of the higher level members.  In fact, SOI #1 has only had contact with one of the listed Target Violators, and this contact was via a third party.  The affiant expresses doubt that this individual can develop into a significant source of information given the limitations imposed by and secretive nature of drug traffickers.  *Id.* at ¶ 64.  The affiant also discusses and dismisses the feasibility of inserting an undercover agent into the drug trafficking organization "due to the tight-knit

26

nature of such organizations" and given "the compartmentalization of major drug trafficking organizations. *Id.* at ¶ ¶ 65-66.

Next, the affiant explains that while "physical surveillance is an important aspect of this case...surveillance unaided by interception cannot lead to the achievement of this investigation's objectives." *Id.* at ¶ 67.   The affidavit then details various attempts to conduct physical surveillance in the Kansas City metropolitan area. *See id.* at ¶ ¶ 68-79. These "surveillances were based on information received from Denver, Colorado and Minneapolis, Minnesota wire intercepts." *Id.* at ¶ 68.   However, "the information obtained as a result of the surveillances was limited because the target subjects became evasive and unusually cautious in their movements threatening discovery of surveillance and the existence of this investigation." *Id.*   For example, the affidavit details one occasion where the investigative team followed a white Ford Crown Victoria as it went back and forth between what was believed to be Rene's residence in Roeland Park, Kansas and an address in Kansas City, Kansas. *Id.* at ¶ 72.   At this point, surveillance was terminated out of fear of compromising the investigation when the vehicle being followed by the investigative team made sudden and quick lane changes and made sudden and abrupt turns down side streets. *Id.*

The affiant does "not believe that surveillance could conclusively establish the structure of the Target Organization, the roles of the members of the organization, or identify additional conspirators, sources of supply, or controlling parties of the conspiracy." *Id.* at ¶ 74.   The affidavit does detail several large seizures of

27

currency–$169, 730, $448,960, $135,005–conducted on August 22, 2006, September 1, 2006, October 6, 2006 respectively based upon information learned from wire intercepts. *See id.* at ¶¶ 76-78. In addition, through previous wire intercepts from other jurisdictions, investigators were able to learn about several of Rene's residences and were able to install pole cameras outside these addresses to help establish the time pattern of individuals coming and going and the types of vehicles used. However, the affiant states that the pole cameras do not provide enough information to grasp the entire scope of the organization.

The affiant then describes the limitations of physical surveillance and explains that "prolonged or regular surveillance of the movements of the conspirators would most likely be noticed, causing members of the Target Organization to become more cautious in their illegal activities and/or flee to avoid further investigation and prosecution." *Id.* at ¶ 80. The affiant explains that while surveillance can be used to confirm meeting and other suspected activities between alleged conspirators, surveillance alone is not generally sufficient to prove the purpose of the meetings. In addition, "it is extremely difficult to effectively watch major narcotics traffickers over an extended period of time without detection" because of their efforts to disguise their activities with trivial errands. *Id.* at ¶ 82.

The affidavit next details why search warrants would currently impede rather than help the investigation. *See id.* at ¶ 86-88. Specifically, the affiant describes how in his training and experience searches of stash locations alert the conspirators of the

28

investigation and often cause individuals to flee or drastically change their operations. The affiant also points out that the search warrants are not necessarily helpful in identifying the full scope of the organization's operations because these organizations frequently maintain multiple locations to store their drugs and drug proceeds and they frequently disguise their records in code. *See id.*

The affidavit then describes why trash pulls have not been an effective investigative tool with this organization. First, on all attempts to collect trash at 4601 West 55th Street in Roeland Park, believed to be one of Rene's residences, no trash has been placed out for pick up despite the fact that surrounding houses in the area have their trash placed at the curb. *Id.* at ¶ 89. Second, investigators were similarly thwarted in their efforts to conduct trash pulls at Rene's new stash house on Lafayette Avenue in Kansas City, Kansas because the residents at this location always leave their trash inside a fence on the property and not on the public street. *Id.* at ¶ 90. The affiant asserts that "[t]he fact that RENE and the other residents leave trash inside the property line at the residence, further validates to investigators that RENE and others know that their trash is able to be collected by investigators." *Id.* The affiant acknowledges that law enforcement could conceivably wait until the local trash removal service picks up the trash from the residences; however, this option makes it difficult to isolate the trash from the target residences as it would be commingled with other trash. The affiant also points out that even if trash pulls were successfully completed, they are unlikely to result in the achievement of the goals of the investigation, namely, identifying the distributors' source

of supply and the co-conspirators, the methods of distribution, or the locations used by the co-conspirators. *Id.* at ¶ 93-94.

The affidavit discusses the use and limitations of pen register and subscriber information. *See id.* at ¶ 95-98. As previously discussed, the government did some toll analysis of Kansas Target Telephone 8 prior to seeking this authorization for wiretap. The usefulness of this information is limited as it "would not necessarily establish the identities of the parties to the conversations or reveal the contents of the conversations." *Id.* at ¶ 95. The affiant also describes that based on his training and experience, a great number of cellular telephones used by narcotics traffickers are subscribed in names other than the person actually using the phone, and they also frequently switch phones in an attempt to avoid detection. For example, while the affiant believed Rene had been using Colorado Target Telephone 9, the listed subscriber was a Kevin Luna. Therefore, determining the subscriber information does not necessarily identify the true individual using the phone.

Finally, the affidavit explains why interviews and grand jury subpoenas are not fruitful means of investigation at this point. *See id.* at ¶ 99-100. While the affiant acknowledges that interviews can be a successful tool in developing information, he explains that such information is frequently out of date which impedes the furtherance of an active investigation. The affiant also states that "[i]nterviewed subjects have been unable to identify the full scope of the RENE drug trafficking organization." *Id.* at ¶ 99. The affiant explains that grand jury subpoenas are not practical currently as all of the

organization's members are not fully identified.  The affiant also fears that such grand jury inquiries would only serve to drive the operation underground and potentially lead to the destruction of key records or evidence, thereby compromising the ongoing investigation.

## 2. Kansas Target Telephone 9

The initial affidavit[16] in support is seventy-six pages in length and describes in detail the investigation of this organization that was believed to be distributing large amounts of marijuana and cocaine in Kansas, Missouri, Colorado, Virginia, Minnesota, New Mexico, Texas, Mexico, and other locations yet unknown.  This affidavit, like the one supporting the application for Kansas Target Telephone 8, details the basis for

---

[16]*See* "Affidavit in Support of Application for an Order Authorizing the Interception of Wire Communications" (dated January 4, 2007).  The wiretap on Kansas Target Telephone 9 was re-authorized eight times, with affidavits in support of seventy-seven, eighty, ninety-two, ninety, ninety-five, ninety-six, one hundred, and one hundred five pages in length.  Each affidavit in support for continued wiretapping incorporated the previous affidavits and added information that had been gained since the previous authorization. *See* "Affidavit in Support of Application for Extension of the Order Authorizing the Interception of Wire Communications" (dated February 2, 2007); "Affidavit in Support of Application for a Second Extension of the Order Authorizing the Interception of Wire Communications" (dated March 2, 2007); "Affidavit in Support of Application for a Third Extension of the Order Authorizing the Interception of Wire Communications" (March 30, 2007); "Affidavit in Support of Application for a Fourth Extension of the Order Authorizing the Interception of Wire Communications" (dated April 27, 2007); "Affidavit in Support of Application for a Fifth Extension of the Order Authorizing the Interception of Wire Communications" (dated May 25, 2007); "Affidavit in Support of Application for a Sixth Extension of the Order Authorizing the Interception of Wire Communications" (dated June 22, 2007); "Affidavit in Support of Application for a Seventh Extension of the Order Authorizing the Interception of Wire Communications" (dated July 20, 2007); and "Affidavit in Support of Application for the Eighth Extension of the Order Authorizing the Interception of Wire Communications" (August 17, 2007).

probable cause, the people expected to be intercepted along with their alleged involvement in the drug trafficking organization, and then explains why traditional methods of investigation are infeasible.  The subscriber for Kansas Target Telephone 9 is Hugo Garcia of 1340 East Washington Street, Kansas City, Kansas; however, it is believed that the person using the phone is Ysidro Juarez, a.k.a. Rene.  "Affidavit in Support of Application for an Order Authorizing the Interception of Wire Communications," (dated January 4, 2007), at ¶ 10.  This affidavit re-iterates that law enforcement believed Rene to be a distributor and/or transporter of large-scale quantities of marijuana, cocaine, and other controlled substances who is based in the Kansas City metropolitan area.  *Id.* at ¶ 13.

The affidavit details law enforcement's current understanding of the scope of the operation and Rene's role in it.  For example, the affidavit details the information the investigators have already acquired from their wiretaps from other jurisdictions.

Next, the affidavit provides toll analysis of Kansas Target Telephone 9 from December 9, 2006 to December 11, 2006.  *See id.* at ¶ ¶ 52- 54.  In this period, Kansas Target Telephone 9 placed or received at least eighty telephone calls; however, due to a technical problem, Sprint/Nextel was unable to recall all the telephone numbers contacted by Kansas Target Telephone 9, and therefore, was able to send only an incomplete report in response to the administrative subpoena.  *Id.* at ¶ 52.  For example, all of Rene's contacts with Chicharo for which Rene used the direct-connect feature and Chicharo used Colorado Target Telephone 10 were not recorded by the Sprint/Nextel

system; however, they were recorded and captured via Denver DEA's intercepts of Colorado Target Telephone 10.

Of the eighty phone calls that were listed in the report issued by Sprint/Nextel, Rene had multiple contacts with several individuals known to be heavily involved in drug trafficking. For example, in this time period, Kansas Target Telephone 9 had fifteen contacts with 816-277-1137, identified as utilized by MILO–a main narcotics customer of Rene's residing in the Kansas City area. The phone had seven contacts with 913-400-1088, identified as utilized by CHACA–a Kansas City area source of supply of narcotics for Rene. The phone had one contact with 773-977-4556, identified as utilized by CHEJO–Rene's main acquaintance and "runner" in his narcotics trafficking operations. Kansas Target Telephone 9 also had contact with several Mexican telephone numbers.[17]

A pen register order was issued by the United States District Court for the District of Kansas on December 19, 2006 for Kansas Target Telephone 9. From December 19, 2006 to December 28, 2006, Kansas Target Telephone 9 placed or received 1104 telephone calls. Between these dates, the telephone placed or received thirty-seven calls to and from 816-277-1137, identified as a number for MILO–a main narcotics customer of Rene residing in the Kansas City area. The telephone placed or received 145 calls to

_____

[17] Due to the amount of Mexican National numbers contacted in this period, the affiant states he believes Rene was using Kansas Target Telephone 9 to contact both family members and suppliers of narcotics living in Mexico to inform them of his switch to Kansas Target Telephone 9.

and from the IMSI number 316010105011355, identified as correlating to the cellular telephone of 773-977-4556 of CHEJO–Rene's main acquaintance and "runner."  The telephone placed or received sixty-two telephone calls from the UFMI number of 62*15*74808, identified as the UFMI number for a cellular telephone used by LUIS–a source of supply for Rene.  The telephone placed or received 142 telephone calls from the IMSI number of 316010105031403, identified as the IMSI number associated with Rene's girlfriend ERICA, who also is known to assist Rene with his drug trafficking activities.  The telephone also had several contacts with Mexican National numbers, including one identified as belonging to RAFA, Rene's main source of supply of marijuana.  The affiant then explains that he believes Rene's frequent contact with Rafa indicates that Rene is still involved in the trafficking of narcotics.

The affidavit then explains how traditional investigative techniques have been tried and failed or appear unlikely to succeed or are too dangerous to attempt.  The necessity section of this affidavit is approximately nineteen pages in length and contains the same subsections as the affidavit for Kansas Target Telephone 8.

## 3. Conclusion

After reviewing the entire contents of the affidavits, the court is satisfied that they provide an adequate showing of necessity for the issuance of wiretap orders for Kansas Target Telephones 8 and 9.  The affidavits are not conclusory.  They contain sufficient factual details explaining the extent to which traditional investigative techniques had already been used or not used and why use of those techniques would have been largely

futile at that point.  The affidavits indicate that this was a drug organization consisting of a wide variety of individuals and large quantities of drugs.  Law enforcement officers had already conducted visual surveillance, and had utilized pen registers prior to the issuance of the wiretap orders.  Unfortunately, the use of confidential informants did not appear to be fruitful in attempting to investigate this particular drug trafficking organization.  The affidavits did describe law enforcement's attempt to develop a Source of Information; however, this individual did not know enough about the organization and its many members to provide much help to the investigation and eventually DEA terminated its attempt to develop this source of information. The government correctly points out that more overt surveillance and/or the use of grand jury subpoenas could have compromised the investigation.  Similarly, the use of search warrants could blow the cover of the investigation without providing information concerning the scope of the organization.   Using undercover agents to infiltrate the organization was also not feasible.

In addition, the defendant is incorrect in his assertion that law enforcement did not use pen registers or attempt trash pulls before seeking authorization for the Kansas wiretaps.  The affidavit in support of the application for Kansas Target Telephone 9 details a pen register that was used on the phone prior to the court's authorization to tap it.  The affidavit also points out the limitations of using a pen register given the ability of drug traffickers to conceal the true user of a telephone through false subscriber information and because pen registers obviously do not reveal the content of the

conversation as these records just detail the telephone numbers of outgoing and incoming calls.  In addition, the affidavits in support of both applications explain how this particular organization either refused to put out trash for collection or made sure the trash that was put out was not on public property in order to thwart any law enforcement attempts to gather evidence via a trash pull.  Given the factual background of the investigation, the court is satisfied that normal investigative procedures were tried and failed or reasonably appeared to have been unlikely to succeed if tried.

The defendant argues in his original motion and his additional memorandum in support of his motion to suppress that the affiants merely used "boilerplate excuses" as to why wiretaps were necessary.  He is correct that the affidavits in support of the original wiretaps and in support of the extensions of those wiretaps are largely the same from one extension to the next.  However, Special Agent Doug Dorley testified at the motion hearing new information was added to each affidavit as events occurred that were relevant to analyzing the various aspects of necessity, and a close examination of the original affidavits and their extensions supports his assertion.  As the government correctly points out in its response to the defendant's additional memorandum in support (Doc. 170), the fact that the same words and phrases are used in the affidavits to explain why an investigative technique would not achieve the goals of the investigation does not make the affidavit "boilerplate." When any new relevant event occurred, the affiant included the new information and then explained why Title III intercepts were still necessary to achieve the goals of the investigation.

As the Tenth Circuit explained recently in *United States v. Zapata*, "[t]he government is not required, as part of the necessity showing under § 2518, 'to exhaust all other conceivable investigative procedures before resorting to wiretapping.'" 546 F.3d 1179, 1186 (10th Cir. 2008) (quoting *Edwards*, 69 F.3d at 429).  As a result, in considering challenges to wiretap orders on necessity grounds, the Tenth Circuit has upheld orders where:

> (1) several investigatory methods had been utilized prior to resort to wiretapping; (2) normal investigative techniques had been frustrated by various problems local police were unable to overcome; (3) increased visual surveillance would have increased the possibility of detection; and (4) potential witnesses were unwilling to testify in court because of fear of reprisal.

*Id.* (quoting *Edwards*, 69 F.3d at 429-430).  Here, law enforcement officers attempted multiple investigatory methods; however, continued physical surveillance was thwarted and officers were concerned about revealing the existence of the investigation too soon before all of the goals repeatedly identified in the affidavits and explained by Special Agent Dorley at the combined motions hearing were accomplished.  Namely, the government wanted to identify members of the conspiracy, sources of supply, and assets of the conspiracy.  The government has shown that these goals could not be achieved without the use of electronic surveillance.  In fact, "[t]he determination of the dimensions of an extensive drug conspiracy [has] been held to justify the use of electronic surveillance." *United States v. Johnson*, 645 F.2d 865, 867 (10th Cir. 1981).  *See also United States v. Newman*, 733 F.2d 1395, 1399 (10th Cir. 1984) (citing *Johnson* to hold that an affidavit in support of a wiretap application satisfied the necessity requirement

where the prior investigation into a drug conspiracy had failed to reveal the source of the drugs and the extent of the conspiracy). Thus, issuance of the wiretap orders were warranted  in order to effectively penetrate this drug trafficking organization.

IT IS THEREFORE ORDERED BY THE COURT THAT Mr. Cervantes-Samaniego's Motion for a Bill of Particulars (Doc. 156) is granted in part and denied in part.  The government shall disclose the identity of any unindicted co-conspirators forty-five days before trial; however, defense counsel shall not disclose this information to their clients until thirty days before trial.

IT IS FURTHER ORDERED BY THE COURT THAT Mr. Cervantes-Samaniego's Motion to Sever (Doc. 159) is denied.

IT IS FURTHER ORDERED BY THE COURT THAT Mr. Cervantes-Samaniego's Motion to Suppress Electronic Surveillance (Doc. 161) is denied.

IT IS SO ORDERED.

Dated this 1st day of July, 2009, in Kansas City, Kansas.


s/ John W. Lungstrum
John W. Lungstrum
United States District Judge